1
2
3
4                    UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF CALIFORNIA
6

7   BILLFLOAT INC.,                    Case No. 20-cv-09325-EMC
8              Plaintiff,              **PUBLIC/REDACTED VERSION**
9        v.
                                       **ORDER GRANTING IN PART AND
10  COLLINS CASH INC., et al.,         DENYING IN PART DEFENDANT'S
                                       MOTION FOR SUMMARY
11             Defendants.             JUDGMENT, AND GRANTING IN
                                       PART AND DENYING IN PART
12                                     PLAINTIFF'S MOTION TO EXCLUDE
                                       EXPERT TESTIMONY**
13
                                       Docket Nos. 42-43
14
15

16       Plaintiff Billfloat Inc. (dba SmartBiz Loans) has filed suit against Defendants Collins Cash

17  Inc. (dba Smart Business Funding) and its owner Abraham Cohen, asserting, *inter alia*, trademark

18  infringement.  Currently pending before the Court are two motions: (1) Defendants' motion for

19  summary judgment and (2) Billfloat's motion to exclude testimony from Defendants' expert, Mark

20  Keegan.  Having considered the parties' briefs and accompanying submissions, as well as the oral

21  argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part the motion for

22  summary judgment and **GRANTS** in part and **DENIES** in part the motion to exclude expert

23  testimony.

24              I.        **MOTION FOR SUMMARY JUDGMENT**

25       In the operative second amended complaint, Billfloat asserts the following causes of

26  action: (1) federal trademark infringement; (2) federal unfair competition; (3) breach of contract;

27  (4) state law trademark infringement; and (5) unlawful business practices under state law.

28       In their summary judgment motion, Defendants argue that they are entitled to relief on all

1   claims.  As to all claims (including the claim for breach of contract which is effectively predicated

2   on trademark infringement), Defendants assert that no reasonable jury could find a likelihood of

3   confusion between the two word marks at issue, SmartBiz and Smart Business Funding.  As to the

4   trademark infringement claims, Defendants also argue that they are entitled to summary judgment

5   on their affirmative defense of laches.  Finally, Defendants contend that there is no evidence to

6   support Billfloat's claim for breach of contract.

7   A.      Likelihood of Confusion

8           Likelihood of confusion is a critical element in a trademark infringement or related claim.

9   "To prevail on [a] Lanham Act trademark claim, a plaintiff must prove: (1) that it has a protectible

10  ownership interest in the mark; and (2) that the defendant's use of the mark is likely to cause

11  consumer confusion."  *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202 (9th Cir.

12  2012) (internal quotation marks omitted).

13          The *Sleekcraft* factors are typically considered in evaluating likelihood of confusion.

14  Those factors are as follows:

15              (1) strength of the mark; (2) proximity of the goods; (3) similarity of
                the marks; (4) evidence of actual confusion; (5) marketing channels
16              used; (6) type of goods and the degree of care likely to be exercised
                by the purchaser; (7) defendant's intent in selecting the mark; and (8)
17              likelihood of expansion of the product lines.

18  *Rearden*, 683 F.3d at 1202.  "[T]his eight-factor analysis is pliant, illustrative rather than

19  exhaustive, and best understood as simply providing helpful guideposts.  Given the open-ended

20  nature of this multi-prong inquiry, . . . summary judgment on likelihood of confusion grounds is

21  generally disfavored."  *Id.* at 1210 (internal quotation marks omitted); *see also id.* at 1202

22  ("'Because of the intensely factual nature of trademark disputes, summary judgment is generally

23  disfavored in the trademark arena.'").

24          In the case at bar, the Court concludes that summary judgment is not warranted precisely

25  because there are fact intensive disputes related to likelihood of confusion.  Although a reasonable

26  jury could easily find in favor of Defendants based on the current record, it is not possible to say

27  that no reasonable jury could find in favor of Billfloat.  Some *Sleekcraft* factors favor Billfloat,

28  others Defendants, and still others have elements that favor each party.  For example:

United States District Court
Northern District of California

2

- The two word marks at issue – SmartBiz and Smart Business Funding – clearly have some similarity.  Both use the word "Smart"; also, "Biz" is an abbreviated version of "Business."  On the other hand, "Biz" and "Business" are not exactly the same.  In addition, Defendants' mark uses the word "Funding" whereas Billfloat's mark does not – although one could argue that this distinction does not have that much, if any, significance.  *Cf. Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, 778 F. Supp. 2d 261, 267 (E.D.N.Y. 2011) ("Defendants' mark 'Pretty Girl' is identical to Plaintiff's but for the addition of the word 'Fashions.'  The addition of one generic word does not transform the name into a different mark.").  Significantly, the court may take into account not just "'the similarity of the marks in the abstract, but rather in light of the way the marks are encountered in the marketplace and the circumstances surrounding the purchase'" – *e.g.*, in labels and advertising materials.  *Pom Wonderful Ltd. Liab. Co. v. Hubbard*, 775 F.3d 1118, 1128 n.7 (9th Cir. 2014).  *See also Lodestar Anstalt v. Bacardi & Co.*, 31 F.4th 1228, – (9th Cir. 2022) (noting that plaintiff's "expert failed properly to address how consumers would encounter the Untamed Word Mark in the marketplace"); *SportPet Designs, Inc. v. Cat1st Corp.*, No. 17-CV-0554, 2018 U.S. Dist. LEXIS 34355, at *15 (E.D. Wis. Mar. 2, 2018) (acknowledging defendant's point that at issue was whether it infringed plaintiff's word mark but indicating that did not make the parties' logos irrelevant; "the central issue in a trademark dispute is whether 'consumers are likely to be confused as to the source' of the goods at issue 'in light of what happens in the marketplace,'" and therefore, "'courts generally evaluate a mark as it's actually used, regardless of how it's registered – as a typewritten word, a word in a particular font, and so on'"); *accord* McCarthy on Trademarks and Unfair Competition § 19:58 (stating that "'[a] standard character registration [*i.e.*, where a mark consists of standard letters or numbers without a claim to any particular font, size, or color] does not override the requirement that likelihood of confusion be measured by the perceptions of consumers in the marketplace, including the effect

of packaging'").  In the case at bar, the parties advertise through, *e.g.*, their websites which include their logos, and the parties' respective logos are quite different in appearance.

- The strength of a mark has two components: (1) conceptual strength, which is "the placement of the mark on the spectrum of marks" and (2) commercial strength, which is "the amount of marketplace recognition of the mark."  9th Cir. Model Civil Jury Instruction No. 15.19; *see also GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000).  Arguably, the conceptual strength of the SmartBiz mark is not that great – *i.e.*, suggestive at most.  *See Inhale, Inc. v. Inhale, LLC*, No. 6:19-cv-01780-AA, 2020 U.S. Dist. LEXIS 192145, at *15 (D. Or. Oct. 16, 2020) (noting that there are five categories of conceptual strength: generic, descriptive, suggestive, arbitrary, and fanciful; "[d]escriptive marks 'describe a particular quality, function, or characteristic of a product or service,'" while "[s]uggestive marks do not 'describe the product's features,' but' they do 'suggest[] them'").[1]  On the other hand, Billfloat has presented some evidence that its mark has commercial strength.  *See, e.g.*, Opp'n at 8 (citing evidence related to Billfloat's marketing and advertising costs, awards, etc.).

- Billfloat does not seem to challenge Defendants' contention that Collins Cash started to use the Smart Business Funding mark in December 2014.  Nor does Billfloat seem to offer any evidence that, *at that particular point in time*, Defendants knew about the SmartBiz mark.  Thus, Defendants may argue that they did not have ill intent in selecting the Smart Business Funding mark.  Although Billfloat argues that Defendants knew about the SmartBiz mark when Collins Cash filed an application to register its Smart Business Funding mark in 2020 (which

---

[1] According to Billfloat, Defendants are barred from contending that the SmartBiz mark is descriptive because the mark has achieved incontestable status.  *See Park 'n Fly v. Dollar Park & Fly*, 469 U.S. 189, 205 (1985) ("conclud[ing] that the holder of a registered mark may rely on incontestability to enjoin infringement and that such an action may not be defended on the grounds that the mark is merely descriptive").

was after it had already received a cease-and-desist letter from Billfloat), the issue is what was a defendant's intent in adopting its mark in the first instance, not whether it continued to use its mark after being notified of potential infringement. Of course, whether there was an intent to infringe is not dispositive of a trademark infringement claim.

- The bulk of Collins Cash's business seems to be merchant cash advances and not loans, including SBA loans (as with Billfloat); nevertheless, both Billfloat and Collins Cash offer financial services to small businesses.  *See Am. Int'l Group, Inc. v. Am. Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1988) (noting that "there is some minor overlap of their respective services[;] [a]lthough the parties are not direct competitors, they both provide financial services" and "[t]heir businesses may be sufficiently 'complementary' or 'related' that the public is likely to be confused as to the source of the services").  Furthermore, even though Defendants claim that Collins Cash does not offer SBA loans itself, Collins Cash has offered such loans through third parties, including Billfloat.  *See also* Salen Decl., Ex. KB (Cohen Depo. at 130) (testifying that keywords used by CollinsCash in Google AdWords campaigns include SBA loans, PPP loans, paycheck protection loans; "[t]hroughout the history of our company, we have offered those products through third parties").  However, there is no specific evidence about the degree of overlap in targeted customers of Billfloat and Collins Cash.

- There is no indication that Billfloat intends to expand into the merchant cash advance field.  Similarly, there is no evidence that Collins Cash intends to offer SBA loan services – but, as noted above, Defendants admit that Collins Cash has referred such business to others, including Billfloat.

- Both parties appear to use their respective websites to drum up business.  However, the parties' websites also reflect the different logos used by the companies.

- Billfloat's customers who are usually taking out SBA loans are likely exercising care in making their choices.  *Cf.* Gray Decl., Ex. 51 (Singer Depo. at 143)

5

(testifying that many of the business owners who use Billfloat's service are sophisticated). On the other hand, the same may be less true of Collins Cash's customers who typically seek merchant cash advances to the extent their qualification process is less complicated than applying for an SBA loan.

- Billfloat has pointed to some instances where there might be actual confusion, either by consumers or by other participants in the industry. *See Rearden*, 683 F.3d at 1215-16 (stating that (1) "non-consumer confusion can serve as a proxy for consumer confusion," and (2) "non-consumer confusion can bear on the 'likelihood of confusion' inquiry insofar as non-consumer confusion can contribute to consumer confusion"). On the other hand, it is not clear that all of those instances exhibit actual confusion. *See, e.g.*, McCarthy on Trademarks & Unfair Competition § 23:16 (noting that some courts have found evidence of actual confusion based on "customers' enquiries to plaintiff as to whether plaintiff and defendant are affiliated or connected," but "other courts have said that a question as to possible affiliation reveals that the questioner had the difference in mind or else would not have bothered even to enquire"); McCarthy on Trademarks and Unfair Competition § 23:14 (indicating that "a likelihood of confusion must be shown by more than an 'occasional misdirected letter' [but] evidence of misdirected letters is entitled to some weight as indicative of a likelihood of confusion"); *ComponentOne, L.L.C. v. ComponentArt, Inc.*, No. 02: 05cv1122, 2008 U.S. Dist. LEXIS 87066, at *64 (W.D. Pa. Oct. 27, 2008) (stating that "[t]he probative value of a misdirected communication, like the emails ComponentOne has submitted, is decreased when the Court cannot tell whether the mistake resulted from the author's confusion of the parties' similar marks or from inadvertence"). Moreover, even if all instances are credited (four total), that is a small number. While Defendants' expert's survey suggests that the likelihood of confusion is remote, the survey is not dispositive and is subject to legitimate criticism, as discussed below.

B.      Laches

        Defendants argue that, even if the Court denies them summary judgment based on the lack of a likelihood of confusion, they should still be awarded relief based on their affirmative defense of laches, which applies to their federal and state trademark infringement claims.  According to Defendants, there is no genuine dispute of material fact that laches applies.[2]  Defendants have the burden of proving their affirmative defense.

        "A party asserting laches must show that [1] it suffered prejudice as a result of [2] the plaintiff's unreasonable delay in filing suit."  *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 835 (9th Cir. 2002).  In the instant case, there are genuine disputes of material fact related to unreasonable delay.[3]  According to Defendants, Billfloat knew or at least should have known about the infringement in August 2015, when a Billfloat employee sent the following email to Collins Cash (at anthony@smartbusinessfunder.com):

> My name is Aleks [Flom], and I am the Director of Business Development at SmartBiz Loans.  We are a financial technology company with a platform to expedite underwriting and funding of SBA 7(a) loans with our partner lenders.  SmartBiz has a lucrative partnership program with commercial loan brokers such as yourself. We specialize in SBA 7(a) loans $350k and under, and have helped many small business owners get the capital they need for their business.
>
> I see that you don't have an SBA product offering, and would love to discuss a strategic relationship with you!  Please shoot me an email or give me a call when you have a moment.

---

[2] The parties do not appear to dispute that laches is also a defense to the state trademark infringement claims as well.

[3] Unreasonable delay is measured in part by the statute of limitations.  The most recent word from the Ninth Circuit is that there is a four-year limitations period for trademark infringement claims. *See Pinkette Clothing, Inc. v. Cosmetic Warriors, Ltd.*, 894 F.3d 1015, 1025 (9th Cir. 2018) (stating that "[t]he most analogous state statute of limitations in this case is California's four-year statute of limitations for trademark infringement actions"); *Internet Specialties W., Inc. v. Milon-Digiorgio Enters.*, 559 F.3d 985, 990 n.2 (9th Cir. 2009) (stating that "'[a] laches determination is made with reference to the limitations period for the analogous action at law'[;] [n]either party disputes the imputation of the four-year limitations period from California trademark infringement law, and we agree that this was the correct period to use"); *see Kiva Health Brands LLC v. Kiva Brands Inc.*, 439 F. Supp. 3d 1185, 1193-94 (N.D. Cal. 2020) (explaining that the limitations period should be four years where the Lanham Act claim is not based on false and deceptive advertising – *i.e.*, fraud).

United States District Court
Northern District of California

1   Cohen Decl., Ex. 35 (email).

2           But even if Mr. Flom himself was personally aware of the use of the mark

3   "smartbusinessfunder," his knowledge may not be given operative weight if he was simply a low-

4   level employee with no responsibility to monitor for or report trademark infringement.  *See*

5   *Alphaville Design, Inc. v. Knoll, Inc.*, 627 F. Supp. 2d 1121, 1134 (N.D. Cal., June 5, 2009) (Patel,

6   J.) ("'A corporation is not charged with notice [of trademark infringement] if business dealings

7   with defendant were conducted by lower echelon employees who had no duty to report instances

8   of trademark infringement.'"); McCarthy on Trademarks and Unfair Competition § 31:39 ("A

9   corporation is not charged with notice if business dealings with defendant were conducted by

10  lower echelon employees who had no duty to report instances of trademark infringement.

11  Similarly, the knowledge of a plaintiff's sales representative will not be imputed to a corporate

12  plaintiff where it was not the duty of the sales representative to investigate trademark

13  infringement.  In order to impute an agent's knowledge to a principal, it must be shown that the

14  agent had duties with respect to trademark matters, although the agent need not have acquired his

15  knowledge in connection with those duties.").  It will be up to the jury to decide whether Mr.

16  Flom's knowledge should be attributed to Billfloat.[4]

17  C.      Breach of Contract

18          Finally, Billfloat has a claim for breach of contract based on the business relationship that

19  it entered into with Collins Cash.  According to Billfloat, the parties entered into a formal contract

20  – the Partner Terms Agreement – in May 2018.  *See* Greiner Decl. ¶ 10; Singer Decl. ¶ 4; *see also*

21  Salen Decl., Ex. U (agreement).  The agreement contains the following provision related to

22  trademarks:



27
————————————
28  [4] The Court rejects Defendants' contention that the Greiner declaration, submitted by Billfloat
    with respect to the laches issue, should be given no consideration.

1   Salen Decl., Ex. U (Agreement ¶ 6(a)); *see also* SAC ¶ 59 ("The essential terms of the contract

2   were clearly and unambiguously laid out in the terms and conditions and included that Defendant

3   would not use or reproduce Plaintiff's intellectual property outside of the Program.").

4         In the pending motion, Defendants argue that they are entitled to summary judgment on the

5   claim for breach of contract for several reasons: (1) there is no proof that the parties entered into a

6   contract ("Plaintiff has not produced a contract signed by either defendant," Mot. at 10); (2)

7   Billfloat did not perform under the contract as it was required because it failed to pay Defendants

8   money that was owed for business referrals; and (3) Defendants did not breach the contract

9   because they never used Billfloat's mark nor did the use of their own mark infringe on Billfloat's

10  mark.

11        For purposes of the pending motion, the Court need only address part of the third

12  argument.  The Court agrees with Defendants that there is no genuine dispute of material fact that

13  they did not breach the agreement because the agreement only barred Defendants from using the

14  SmartBiz mark in certain circumstances – *i.e.*, the agreement did not bar Defendants from using

15  their own mark.  The contractual terms do not purport to cover use of allegedly infringing marks

16  which are not the actual marks expressly protected by the agreement.

17        Accordingly, the Court grants summary judgment to Defendants on the claim for breach of

18  contract.

19  D.     Summary

20        The Court grants Defendants summary judgment on the claim for breach of contract.  The

21  motion for summary judgment is otherwise denied.

22            **II.        MOTION TO EXCLUDE EXPERT TESTIMONY**

23        Consumer survey evidence may be used by parties in trademark infringement cases to

24  show that there is or is not a likelihood of confusion.  In the instant case, Defendants hired an

25  expert, Mr. Keegan, to provide a report.  As stated in his report, he was "asked to determine the

26  extent to which, if at all, there is a likelihood of confusion among relevant consumers between

27  small business financing services offered under the contested 'Smart Business Funding' brand

28  name (as marketed by the defendants) and the plaintiff's 'SmartBiz'-branded small business

1   financing services."  Keegan Rpt. ¶ 2.  He concluded that

2           there is no likelihood of confusion among relevant consumers
3           between the SmartBiz and Smart Business Funding brands.
            Specifically, an average net of just 6.3 percent of respondents
4           mistakenly believed that Smart Business Funding and SmartBiz are
            the same company or are affiliated in some way.  This net confusion
5           finding falls well below the minimum threshold that is typically
            viewed as evidence of a likelihood of confusion among relevant
6           consumers.

7   Keegan Rpt. ¶ 4.  Billfloat did not hire its own expert to conduct a consumer survey and opine on

8   likelihood of confusion.  However, Billfloat did hire a rebuttal expert, Ms. Pittaolulis who

9   criticized Keegan report.

10          In the pending motion, Billfloat argues that Mr. Keegan should not be allowed to provide

11  testimony at trial for several reasons:

12          (1) Mr. Keegan claimed to give what is known as a *Squirt* survey but such a survey is

13              dependent on approximating marketplace conditions, and Mr. Keegan's survey

14              failed to approximate marketplace conditions.

15          (2) Mr. Keegan should have surveyed potential consumers of Collins Cash's

16              goods/services but his pool of participants was both underinclusive and

17              overinclusive.

18          (3) Mr. Keegan's survey did not include a true control group – *i.e.*, a *separate* control

19              group – and the purported controls used (webpages of other companies offering

20              small business financial services) were not appropriate.

21          (4) Mr. Keegan improperly included in the survey a statement describing the

22              goods/services associated with the marks.

23          (5) Mr. Keegan failed to address the possibility that participants could believe that only

24              one answer was possible and further failed to sufficiently "randomize" the order of

25              the different webpages shown to participants.

26          (6) Mr. Keegan improperly offered a legal conclusion.

27  A.      Legal Standard

28          Federal Rule of Evidence 702 provides as follows:

United States District Court
Northern District of California

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)   the testimony is based on sufficient facts or data;

(c)   the testimony is the product of reliable principles and methods; and

(d)   the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

With respect to (c) above, reliability

requires that the expert's testimony have "a reliable basis in the knowledge and experience of the relevant discipline."  The district court must assess whether "the reasoning or methodology underlying the testimony is scientifically valid" and "properly can be applied to the facts in issue," with the goal of ensuring that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." "The test 'is not the correctness of the expert's conclusions but the soundness of his methodology,' and when an expert meets the threshold established by Rule 702, the expert may testify and the fact finder decides how much weight to give that testimony."

The reliability analysis is "a malleable one tied to the facts of each case," and "district courts are vested with 'broad latitude' to 'decide how to test an expert's reliability' and 'whether or not an expert's relevant testimony is reliable.'"  Although *Daubert* identifies several factors that may be used for evaluating the reliability of an expert – whether the scientific theory or technique has been tested, peer reviewed, identified as having a particular rate of error, and generally accepted in the scientific community – district courts are not required to consider all (or even any) of these factors, nor are they required to hold a "*Daubert* hearing."

*United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188-89 (9th Cir. 2019).

If an expert's testimony is reliable (as well as relevant), then the party offering the expert

is "entitled to have the jury decide upon [its] credibility, rather than the judge."  "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge.  A district court should not make credibility determinations that are reserved for the jury."  This Court has previously noted that "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."

*Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (U.S. 9th Cir. 2022).

United States District Court
Northern District of California

11

B.      Billfloat's Challenges

The Court has considered each of Billfloat's arguments above and concludes that they are largely challenges that go to the weight of the evidence.  For example:

- Billfloat's own expert never opined that Mr. Keegan's *Squirt* survey was improper because he showed the marks at issue as they appeared on webpages in a hybrid sequential/array format.  In addition, several courts appear to have flexibility on how closely the format used in a *Squirt* survey should mimic marketplace conditions – *i.e.*, such a challenge would go to the weight of the evidence and not its admissibility.  *See, e.g.*, *Marketquest Grp., Inc. v. BIC Corp.*, No. 11-cv-618-BAS (JLB), 2018 U.S. Dist. LEXIS 62361, at *13-14 (S.D. Cal. Apr. 12, 2018) (noting that "[plaintiff's expert's] discussion of a hypothetical preference for a side-by-side comparison rather than a sequential showing does not mean his 'opinions should be excluded wholesale,'" especially as defendant "has not offered any evidence to suggest that the competing marks are likely to be seen in the marketplace sequentially, rather than side-by-side" and "there is some evidence that seems to suggest the opposite[;] [r]egardless, . . . surveys are by necessity imperfect and are to be viewed with an understanding of the challenges faced in their development and implementation" and thus technical defects with the survey simply "go to weight" of the evidence, not admissibility); *Jacobs v. Fareportal, Inc.*, No. 8:17CV362, 2020 U.S. Dist. LEXIS 211840, at *20 (D. Neb. May 29, 2020) (stating that "[i]t seems likely that [the expert] failed to sufficiently approximate the manner in which consumers encountered the parties' products in the marketplace[,] [y]et, that does not alone warrant exclusion of her opinion"; "'[t]he closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results'").  Finally, although Billfloat maintains that a consumer would not see the marks/webpages in some kind of blended sequential/array format, that it not clearly the case.  If a consumer were evaluating goods/services offered on different

United States District Court
Northern District of California

1    websites, she might compare the goods/services by looking at those webpages

2    sequentially, at the same time (*i.e.*, having one screen with two windows open, one

3    for each webpage), or some combination of both.

4    • As noted in the McCarthy legal treatise, "[i]f the survey universe is sufficiently

5    close to the 'correct' universe, it can be regarded as a technical defect, allowed into

6    evidence but given less weight than it would be otherwise entitled.  But if the

7    universe selected is *significantly skewed* away from the proper group of people

8    whose perception is at issue, it may be excluded from evidence altogether."

9    McCarthy on Trademark and Unfair Competition § 32:159 (emphasis added).

10    Billfloat has failed to point to a fundamental problem with Mr. Keegan's universe

11    that would require exclusion.

12    • Although Mr. Keegan did not have a separate test group and a separate control

13    group, *see* McCarthy on Trademarks and Unfair Competition § 32:187 (stating that,

14    "[i]n a trademark likelihood of confusion survey, a properly constructed survey has

15    at least two groups of respondents: one group (the "test cell") is shown the

16    allegedly infringing mark; the second group (the "control cell") is shown a mark

17    similar in appearance to the test cell, except for the designation whose influence is

18    being tested"), Billfloat has failed to establish that the use of control questions

19    instead of a separate control group is improper.  *See, e.g.*, *Longoria*, 2021 U.S.

20    Dist. LEXIS 38478, at *29 ("Although 'less common,' a survey may use a control

21    question, as opposed to a control group.  'Rather than administering a control

22    stimulus to a separate group of respondents, the survey asks all respondents one or

23    more control questions along with the question about the product or service at

24    issue.'") (citing Diamond, *Reference Guide on Survey Research*, at 401).  While

25    Billfloat has raised legitimate concerns as to whether Mr. Keegan chose controls

26    designed to manipulate the net confusion rate, the weight of authority indicates that

27    the improper selection of a control is a basis to attack the evidence's weight but not

28    to exclude.  *See* McCarthy on Trademarks and Unfair Competition § 32:187

United States District Court
Northern District of California

("While a control that contains more elements of the accused mark or trade dress is 'stronger' than one that has fewer, that does not necessarily mean that the survey should be excluded from evidence, rather than just given less weight.  But if a poor control in a trademark owner's survey artificially inflates the net confusion levels, then the survey results will be given little weight."); McCarthy on Trademarks and Unfair Competition § 32:187 ("While a control that contains more elements of the accused mark or trade dress is 'stronger' than one that has fewer, that does not necessarily mean that the survey should be excluded from evidence, rather than just given less weight.  But if a poor control in a trademark owner's survey artificially inflates the net confusion levels, then the survey results will be given little weight."); *see also Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252 (9th Cir. 2001) ("Treatment of surveys is a two-step process. First, is the survey admissible?  That is, is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles? . . . . Once the survey is admitted, however, follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility.").

- Mr. Keegan's description of the webpages (shown to respondents) as being related to "small business financing services" was not improperly leading or slanting.  *See* McCarthy on Trademarks and Unfair Competition § 32:172 ("[A] form of slanting is presenting respondents with particular similarities between the marks rather than letting persons respond to the marks as a whole.").  Mr. Keegan's description of the webpages was not overly suggestive especially since his description was broad, referring to small business financing services and not just, *e.g.*, loans.  Moreover, even if Mr. Keegan's description suggested a commonality, that would seem, if anything, to work to Billfloat's advantage.

- Billfloat asserts failure to counteract two kinds of demand effects: (1) participants may have believed that only one affirmative answer was possible; and (2) Mr.

14

United States District Court
Northern District of California

1     Keegan failed to present the stimuli (the three control pages and

2     smartbusinessfunder.com) in a sufficiently random order.  But the criticism is (1)

3     goes to weight, not admissibility.  As to (2), even if only four orders had been used

4     (*i.e.*, four out of a possible twenty-four orders), Billfloat's main concern was with a

5     "primacy effect" under which a participant "may be predisposed to affirmatively

6     identify an affiliation between the first stimulus shown and the senior mark in a

7     sequential survey."  Mot. at 22.  Here, Smart Business Funding (Collins Cash's

8     mark) came first in two out of the four orders.  If anything, that would benefit

9     Billfloat.

10     • Billfloat raises a concern that Mr. Keegan is expressing a legal opinion on the

11     likelihood of confusion.  For purposes of this opinion, the Court assumes that

12     likelihood of confusion is an issue predominantly factual in nature, not legal.  The

13     Court also acknowledges that Rule 704 does not prevent an expert from opining on

14     an ultimate issue.  Notwithstanding such, there are Rule 403 grounds to limit Mr.

15     Keegan's testimony.  Mr. Keegan should not be allowed to opine outright that there

16     is no likelihood of confusion because this raises the prospect of unfair prejudice.

17     However, he should still be allowed to discuss his survey and the results of his

18     survey – *i.e.*, that "an average net of just 6.3 percent of respondents mistakenly

19     believed that Smart Business Funding and SmartBiz are the same company or are

20     affiliated in some way."  Keegan Rpt. ¶ 4.

21     Accordingly, with the single exception described above, though there are substantial bases

22 for challenging the merits of Mr. Keegan's methodology, the Court does not preclude Mr. Keegan

23 under *Daubert* from providing testimony about his survey.

24     ///

25     ///

26     ///

27     ///

28     ///

United States District Court
Northern District of California

1

### III.   <u>CONCLUSION</u>

For the foregoing reasons, the Court grants in part and denies in part both the motion for summary judgment and the motion to exclude expert testimony.  With this ruling, the parties are ordered to contact Magistrate Judge Kim and explore further settlement talks.

This order disposes of Docket No. 42.


**IT IS SO ORDERED**.


Dated: June 15, 2022

_____
EDWARD M. CHEN
United States District Judge