UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BILLFLOAT INC.,<br><br>    Plaintiff,<br><br>    v.<br><br>COLLINS CASH INC., et al.,<br><br>    Defendants. | Case No. 20-cv-09325-EMC<br><br>**ORDER DENYING PLAINTIFF'S MOTION AND RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND FOR NEW TRIAL, AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR ATTORNEYS' FEES**<br><br>Docket Nos. 137, 138, 141 |

## I.  INTRODUCTION

The plaintiff BillFloat Inc. ("BillFloat") sued the defendants Collins Cash Inc. ("Collins Cash") and its owner Abraham Cohen (collectively, "Defendants") for, *inter alia*, trademark infringement and breach of contract. After a four-day trial solely on the trademark infringement claim, the jury found in favor of Defendants. Now pending before this Court are (1) BillFloat's renewed motion for judgment as a matter of law (JMOL) under Rule 50(b), or alternatively, for a new trial under Rule 59(a) of the Federal Rules of Civil Procedure, and (2) Defendants' motion for attorneys' fees and costs. For the following reasons, the Court denies the former and grants in part and denies in part the latter.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

A.  Relevant Factual Background

BillFloat, the number one Small Business Administration-backed loan ("SBA loan") facilitator in the United States, has been offering business financing services using "SmartBiz" as a trademark since 2013. (Trial Transcript ("TT") 202:25–203:6; Docket No. 126 (Jury Instruction

1  ("JI")) No. 7 (Stipulations of Fact).) It obtained a federal registration for that mark in 2014. (*Id.*)

2  A few years later, BillFloat obtained federal trademark registrations for the marks "SmartBiz

3  Loans" and "SmartBiz Advisor" as well. (*Id.*)

4  Collins Cash also offers financial services to small businesses. Abraham Cohen, an

5  individual residing in Florida, is its owner, sole shareholder, and sole employee. (JI No. 7.) It

6  adopted the "Smart Business Funding" mark in December 2014. (Trial Exhibit ("TX") 128.)

7  The parties entered into a partnership agreement (the "Agreement") in 2018. (JI No. 7; TX

8  150.) Between 2018 and 2020, Collins Cash referred hundreds of its customers to BillFloat under

9  the Agreement, resulting in one deal. (TX 128; TT 231:9-232:25, 398:12-14.)

10  After BillFloat's CEO learned from his father about the Smart Business Funding mark,

11  BillFloat sent Collins Cash its first cease-and-desist ("C&D") letter on April 14, 2020, demanding

12  that Collins Cash stop using the Smart Business Funding mark. (TX 126.) On May 2, Collins

13  Cash applied to register its mark with the United States Patent and Trademark Office ("PTO"). (JI

14  No. 7.) It did not otherwise respond to the C&D letter. Later that month, BillFloat sent a second

15  C&D letter, warning that a lawsuit would follow if Collins Cash persisted using its mark. (TX

16  127.) Collins Cash responded through counsel in June. (TX 128.) In the response letter, it

17  highlighted the parties then-existing partnership and explained its position that the parties' marks

18  were not similar or confusing. (*Id.*) BillFloat sent its final C&D letter on September 8, 2020 and

19  filed suit in December that year. (TX 129; Docket No. 1.) BillFloat terminated its partnership

20  with Collins Cash in April the following year. (TX 237.)

21  B.  Procedural History

22  BillFloat filed this action on December 23, 2020, alleging trademark infringement under

23  federal and state law, unfair competition, and breach of contract. The Court granted Defendants'

24  motion for summary judgment on the breach of contract claim, but denied summary judgment on

25  the remaining claims and on the affirmative defense of laches. (Docket No. 65 ("Order") at 9.)

26  BillFloat voluntarily dismissed the surviving claims, except for trademark infringement under the

27  Lanham Act, before trial. (Docket No. 94 at 1 n.1.) The Court also denied BillFloat's *Daubert*

28  motion challenging the market survey by Defendants' expert, Mark Keegan, except for "opin[ing]

2

outright that there is no likelihood of confusion." (Order at 15.)

During the four-day trial, BillFloat moved for a directed verdict under Rule 50 after the parties had presented the evidence. The Court took that motion under submission. The jury subsequently returned a verdict that neither Collins Cash nor Abraham Cohen had infringed BillFloat's SmartBiz trademarks.

### III. BILLFLOAT'S RENEWED MOTION FOR JMOL OR FOR A NEW TRIAL

BillFloat renews its JMOL, and moves for a new trial in the alternative, on the same grounds: that (1) the Court erroneously allowed the jury to consider Keegan's survey, and (2) the jury might have drawn a negative inference from BillFloat's failure to conduct a survey. (Docket No. 137 ("BF Mot.") at 1–2; (Docket No. 149 ("BF Reply") at 1–2, 14.) The Court denies both motions.

#### A. The Court Denies BillFloat's Renewed JMOL

Under Rule 50(b), courts determine "whether the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury." *Huizar v. City of Anaheim (Estate of Diaz)*, 840 F.3d 592, 604 (9th Cir. 2016) (internal quotation marks and citations omitted). Courts "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). As discussed below, the Court properly admitted the evidence and attorney arguments made at trial. Further, the evidence presented at trial, construed in the light most favorable to Defendants, supports the jury's verdict.

##### 1. The Court Properly Allowed the Jury to Consider Defendants' Market Survey

BillFloat recycles several arguments raised in its *Daubert* motion. First, it argues that Keegan's control stimuli were improper. Specifically, Keegan admitted at trial that a proper control stimulus "should share as many characteristics with the [accused mark's webpage] as possible, with the key exception of the [words of the accused mark]." (TT 536:17–538:10, 599:10–600:13.) But his control webpage differed from that of the accused in many aspects, including the layout and color scheme. (TX 213 at 15–16.) Worse still, BillFloat argues, the control more closely resembled the asserted mark's webpage, thus artificially inflating the baseline

3

of confusion in Keegan's survey.  Second, BillFloat contends that Keegan used a flawed survey design.  Although purporting to be a "Squirt" survey, he did not use a control group and instead showed the same group of respondents an array of four different webpages.  While a survey may, under certain circumstances, use a control question as opposed to a control group, Keegan failed to include a control question.  Third, Keegan's survey universe was both under- and over-inclusive.

Defendants respond that Keegan used proper natural controls to approximate real-world viewing conditions.  And the flaws in a survey's universe were subjects for cross-examination.

The Court declines to revisit its prior holding that each of BillFloat's critiques of Keegan's survey goes to the weight, rather than the admissibility, of his testimony.  (*See* Order at 13–14.)  During trial, BillFloat cross-examined Keegan on each point vigorously.  It concedes that, at trial, its survey expert "explained what a proper survey should look like multiple times," "gave examples of proper questions," "identifie[d] a proper control and proper universe," and "explained how the sum total of each of the aforementioned flaws in Mr. Keegan's survey rendered the survey wholly unreliable for testing likely confusion, and that the survey was actually designed to result in a predetermined outcome."  (P's Reply at 7–8 (citing TT 596:8-598:2, 589:24-590:3, 569:2-3, 588:6, 599:15-18, 603:16-605:5)).)  The jury had sufficient information to properly evaluate the weight of Keegan's testimony.  The cross-examination was thorough, and it could have well decided to give no weight to the survey.  The Court did not err by allowing the jury to consider it.

    2.    <u>The Court Properly Allowed Defendants' Counsel to Argue about BillFloat's Lack of Survey Evidence</u>

BillFloat next contends that multiple factors likely led the jury to draw a negative inference from its lack of a survey, including (1) the admission of Defendants' survey, (2) the absence of a jury instruction that a survey is not required, (3) Keegan's direct testimony that there was "very clearly an indication of a lack of consumer confusion" (TT 501:3–4), and (4) Defendants' counsel's question to BillFloat's survey expert, "if you wanted to prepare a likelihood of confusion survey for this case, how long would it take you" (TT 606:13–14).  (P's Reply at 19–20.)  Although the Court sustained BillFloat's objections to the latter two issues, BillFloat argues

4

1  that simply hearing the testimony and the question prejudiced the jury.

2  But the jury is presumed to follow the Court's instruction on objections and what evidence is to be considered. There is no evidence that shows that the jury ignored the Court's instructions to disregard Keegan's testimony and Defendants' counsel's question at issue. And, as discussed above, the Court properly admitted Keegan's survey (which was subject to vigorous cross-examination) the point of which was to demonstrate no likelihood of confusion. In any event, "a trier of fact may be entitled to presume that one party's failure to conduct a survey concedes that the survey evidence would be unfavorable to it." *Monster, Inc. v. Dolby Lab'ys Licensing Corp.*, 920 F. Supp. 2d 1066, 1072 (N.D. Cal. 2013). These are not grounds for JMOL.

### 3. The Jury Reasonably Could Have Found for Defendants

Furthermore, it is highly unlikely that BillFloat would have been prejudiced by any of these asserted errors. There was substantial and persuasive support for the jury's verdict even in the absence of the Keegan survey.

Under the first *Sleekcraft* factor, *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), the jury reasonably could have easily found BillFloat's SmartBiz mark to be weak. Defendants presented evidence that, by the time BillFloat adopted its SmartBiz mark in 2013, many businesses offering similar services were using "smart," "biz," "business," or "funding" in their brand names. These include "Smart Funding Solutions," "SmartBank," "BizLoans," "SmartLoan," "AdvanceSmart," "Better Business Funding," "Fast Business Funding," and "Smart Business." (TXs 32, 40, 213, 163, 128.) The domain smartbusinessfunding.com goes to a company called "Smart Benefits." (TT 354:9–12.) While BillFloat argued that "Smart Funding Solutions" operated in the UK (TT 274:6–15), the jury nonetheless could have concluded that the other third-party marks—such as "Smart Business"—were so similar to BillFloat's mark as to render it less recognizable by the public. And although BillFloat has incurred significant cost in marketing (TT at 174:6–175:23), it has not provided evidence of the impact on the public's recognition of BillFloat's mark.

When evaluating the proximity of the services, the jury reasonably could have found for Collins Cash. BillFloat showed that both parties offer financing to small businesses and that they

5

share similar customers, such as auth shops, trucking and shipping companies, and restaurants and contractors. (JI No. 7 (Stipulations of Fact); TT 319:5-13; TXs 63, 68, 87, 135.). Despite the similarities, Collins Cash mainly provides merchant cash advances (TT 204:13-14) while BillFloat's "primary focus" is on low-cost bank loans (TT 247:6-9). BillFloat's marketing material explicitly distinguishes its small business loans from merchant cash advance. (TX 16.) Further, evidence shows that 80% of BillFloat's revenue comes from referrals to and from 20 partners that are financial institutions, such as banks. (TT 131:12-13, 164:1-10.) Similarly, 90% of Collins Cash's business comes from broker referrals. (TT 351:3-4.) Given the sophistication of the brokers and BillFloat's marketing materials specifically distinguishing its service from merchant cash advances, the jury reasonably could have taken a more granular view that the parties' primary services differ from each other.

The jury could also easily have found a lack of similarity between the marks under the third factor for at least three reasons. The appearances of the marks often differed as the parties frequently used them with different logos. (TT 261:14–262:4; TXs 117, 223, 224, 226, 228.) *Pignons S. A. de MeCanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (9th Cir. 1981) (recognizing that when a challenged mark is accompanied by the logo of the manufacturer, confusion is unlikely). The logos also had distinct appearances. Collins Cash often used a brain logo with its mark. (TXs 117, 223, 224, 226, 228.) BillFloat, in contrast, has used about 500 different logos since 2013. (TT 261:14-262:4.) "Smart Business Funding" has three words, whereas "SmartBiz" is one word without "Funding." Cohen testified that he never said "SmartBiz" when answering the phone for Collins Cash (TT 358:21–25) and never used "biz" as a shorthand for "business" (TT 358:25–359:1). Although BillFloat showed one instance where a broker used "SmartBiz" as a shorthand for "Smart Business Funding," no evidence showed that the broker confused the two businesses as it was a long-term partner with Collins Cash.

Despite the years of alleged infringement, and its access to customers BillFloat claims were common with Plaintiff, at trial, BillFloat introduced almost no evidence of actual confusion. It introduced six emails that allegedly showed actual confusion. Four were from loan brokers rather than the parties' customers. (TXs 99, 146, 147, 161.) One was from a potential customer

6

whom Collins Cash ultimately referred to BillFloat for an SBA loan under the parties' Agreement. (TX 153.) The last email does show actual confusion by a potential customer (TX 156), but that is *de minimis* against alleged infringement that lasted over eight years when Collins Cash was receiving 40 to 50 thousand emails from potential customers every year (TT: 366:14–16). Therefore, the jury reasonably could have found a lack of actual confusion.

The Court denies BillFloat's renewed JMOL.

B.   The Court Denies BillFloat's Motion for A New Trial

BillFloat seeks a new trial for the same reasons as articulated for its JMOL. Defendants respond that the jury's verdict aligned with the weight of the evidence.

The Court agrees with Defendants. "A district court may grant a new trial only if the jury verdict is contrary to the clear weight of the evidence." *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218 (9th Cir. 2010). A new trial may also be warranted where erroneous evidentiary rulings "substantially prejudiced" a party. *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1328 (9th Cir. 1995) (internal quotations and citation omitted). Prejudice is found only if the error, "more probably than not," has "tainted the verdict." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1030 (9th Cir. 2008). An error has tainted the verdict when, "had [it] been excluded, it would have altered the result of the trial." *Ochoa-Valenzuela v. Ford Motor Co.*, 685 F. App'x. 551, 554 (9th Cir. 2017).

The Court properly admitted Keegan's survey, but even if erroneous, the admission did not substantially prejudice BillFloat. As discussed above, Defendants presented substantial and persuasive evidence that the *Sleekcraft* factors weighed heavily in Defendant's favor. The verdict was not against the clear weight of the evidence, nor was there prejudicial error.

## IV.   DEFENDANTS' MOTION FOR ATTORNEYS' FEES

Defendants request attorneys' fees and costs on two bases: the fee-shifting provision of the Agreement; Section 1117(a) of the Lanham Act. For the following reasons, the Court grants attorneys' fees incurred for the contract claim under the Agreement.

A.   Defendants Gave Adequate Notice of Attorneys' Fees

BillFloat contends that Defendants failed to properly notice their request for attorneys' fees

7

under the contractual fee-shifting provision and therefore are not entitled to reasonable attorneys' fees. (Docket No. 141 ("BF Opp.") at 22.) Specifically, BillFloat argues that attorneys' fees are special damages so Defendants were required to "specifically state" their request in the pleadings for fees under Fed. R. Civ. P. 9(g). (*Id.* at 23.)

Defendants argue that they requested "attorneys' fees pursuant to 15 U.S.C. § 1117(a)" and costs, among other unrelated relief, in their answer to the complaint and the pre-trial conference statement. (Docket No. 34 at 8; Docket No. 90 at 3.) They further argue that BillFloat was on notice when it pursued the breach of contract claim because the fee-shifting provision provided mutuality of remedy. (Docket No. 148 ("Def. Reply") at 4.)

Defendants have provided sufficient notice of attorneys' fees under the Agreement's fee-shifting provision. The Ninth Circuit in *Riordan v. State Farm Mut. Auto. Ins. Co.* rejected the argument that the attorneys' fee motion should be denied for failing to request such in the complaint under Fed. R. Civ. P. 8(a) and 9(g). 589 F.3d 999, 1005 (9th Cir. 2009). Instead, the Ninth Circuit "requires most claims for attorneys' fees to be made by motion under Rule 54(d)(2)" unless substantive law requires it. *Id.* at 1005–06. This is not meaningful with Cal. Civ. Code section 1717. The parties do not dispute that Defendants have met all the requirements of notice by 54(d)(2) motion. Thus, Defendants have provided sufficient notice for their attorneys' fee request.

B.    Defendants Are Entitled to Attorneys' Fees Under the Contract

Defendants seek attorneys' fees for all claims under the Agreement's fee shifting provision. (BF Mot. at 1; TX 150 at 8.) That provision provides:

> b. Governing Law. The Parties agree that this Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to any conflict of law provisions. Should a dispute arise under or in relation to this Agreement, jurisdiction over and venue of any suit arising out of this Agreement shall be exclusively in the state and federal courts of San Francisco, California. ***If either Party employs attorneys to enforce any right arising out of or relating to this Agreement, the prevailing Party shall be entitled to recover reasonable attorneys' fees.***

(TX 150 at 8 (emphasis added).) Cal. Civ. Code section 1717 governs attorney fee awards under contracts. The applicable text reads:

8

> (a) In any action *on a contract*, *where the contract specifically provides that attorney's fees and costs*, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the prevailing party on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorneys' fees in addition to other costs.

Cal. Civ. Code § 1717 (emphasis added). The phrase "on the contract" is liberally construed, such that a claim "on a contract" "involves an agreement, arises under/out of, is based on, or relates to the agreement by seeking to define or interpret its terms to determine or enforce a party's rights or duties." *Douglas E. Barnhart, Inc. v. CMC Fabricators, Inc.*, 211 Cal. App. 4th 230, 242 (2012).

Defendants argue that the breach of contract claim and Lanham Act trademark infringement claim are both "on the contract" because the latter claim is related to the contract. (Docket No. 138 ("Def. Mot.") at 5.) They point to the Second Amended Complaint where BillFloat pleaded that "Defendants have materially breached their duties under the contract, *including by intentionally infringing on Plaintiff's Marks*." (*Id.* at 6; Docket No. 31 ("SAC") at ¶ 61 (emphasis added).)

BillFloat does not dispute that the breach of contract claim is "on the contract," but contends that the trademark infringement claim is not. (BF Opp. at 20.) It rests its argument on the Court's finding that "the contractual terms do not purport to cover use of allegedly infringing marks which are not the actual marks expressly protected by the agreement." (Order at 9.)

The trademark infringement claim does not "arise out of" the Agreement. Claims that "arise out of" a contract have a dependent or causal relationship with it. *See Xuereb v. Marcus & Millichap, Inc.*, 3 Cal. App. 4th 1338, 1343 (1992) (tort actions "arose from" an agreement because they were a result of the underlying transactional relationship in the agreement). Here, the trademark infringement allegedly began in 2014, well before the parties entered into the Agreement on June 6, 2018. (Docket No. 94 at 2.) Therefore, the Lanham Act trademark infringement claim was not a result of the underlying transactional relationship in the Agreement and thus did not "arise out of" the contract.

The trademark infringement claim also is not "related to" the Agreement. Claims that are "related" to a contract claim rely on the same underlying facts and evidence of common issues.

9

"Common issues require virtually the same evidence, with no change in the witnesses deposed, the records reviewed, the discovery performed, or the facts litigated." *Erickson v. R.E.M. Concepts, Inc.*, 126 Cal. App. 4th 1073, 1085 (2005). Here, the trademark infringement claim and the contract claim do not have common issues. The breach of contract claim is about whether Defendants used BillFloat's marks outside of the Agreement, whereas the trademark infringement claim concerns whether Defendants' and BillFloat's marks are so similar such that former infringes the latter. (SAC at ¶¶ 46–51, 58–62.) Not only is the gravamen of the two claims distinct and different, the claims also rely on different facts and evidence. The contract claim requires proof of Defendants' actual use of BillFloat's mark, while the infringement claim relies on proving likelihood of confusion for each of the parties' respective marks using the *Sleekcraft* factors. (SAC at ¶¶ 46–51, 58–62.) Since the claims do not share the same underlying facts, common issues, or the same evidence, they are not related.

Since the Lanham Act trademark infringement claim does not arise out of or relate to the contract, the fee shifting agreement does not apply to such claim. Nor is such claim "on the contract," under section 1717. Defendants are entitled to attorneys' fees incurred for the breach of contract claim, but no more.

C.      Defendants Are Not Entitled to Attorneys' Fees Under the Lanham Act

Alternatively, Defendants seek attorneys' fees incurred on the federal trademark infringement claim under the Lanham Act. (Def. Mot. at 5.) Section 1117(a) of the Lanham Act provides that a district court "in exceptional cases may award reasonable attorney fees to the prevailing party" in a trademark action. 15 U.S.C. § 1117(a). Courts interpret the Lanham Act in tandem with the Patent Act using a two-step inquiry. *See Int'l Olympic Comm. V. S.F. Arts & Athletics*, 781 F.2d 733, 738–39 (9th Cir. 1986). The inquiry first requires the Court to determine whether the case is proven "exceptional," and second to determine whether an award of attorneys' fees is justified. *See SECALT S.A. v. Wuxi Shenxi Constr. Mach. Co.*, 668 F.2d 677, 687 (9th Cir. 2012) ("[O]nce an action is determined to be exceptional, the district court's decision to award attorneys' fees is reviewed.").

1. This Case Is Not "Exceptional"

Under the Ninth Circuit's standard, courts should examine the "totality of the circumstances' to determine if the case was exceptional." *SunEarth, Inc. v. Sun Earth Solar Power Co.*, 839 F.3d 1179, 1181 (9th Cir. 2016). An "exceptional" case is "simply one that stands out from the others," either "with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014). When considering the governing law and the facts of the case under the preponderance of the evidence, courts should exercise equitable discretion and contemplate frivolousness, motivation, objective unreasonableness, and the need to advance considerations of compensation and deterrence. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994).

Defendants first argue that the Lanham Act claim was substantively weak so as to render it meritless and unreasonable. (Def. Mot. at 7.) BillFloat's unfair competition claim had no legal remedy; its breach of contract claim did not pass summary judgement; its trademark infringement claim lost at trial. (*Id.* at 7–13.) BillFloat also engaged in unreasonable litigation conduct, including failure to conduct pre-suit investigation, producing roughly 98,000 documents without an index, refusing to produce basic documents, obstructive deposition conduct, joining Mr. Cohen as a defendant in bad faith, and proceeding to trial for trademark infringement without sufficient evidence. (*Id.* at 13–16; Def. Reply at 4–7.)

BillFloat argues that the trademark infringement claim was not meritless or unreasonable given some of the *Sleekcraft* factors weigh in its favor and the Court denied Defendants' summary judgement on that claim. (BF Opp. at 14–15.) Further, the unfair competition claim, joinder of Mr. Cohen, and deposition obstructions were made in good faith. (*Id.* at 19.) And if any of its discovery conduct was unreasonable, Defendants should have filed motions to compel or for sanction. (*Id.* at 7, 9, 10–11, 13.)

Under the totality of circumstances, BillFloat's claim and conduct do not render this case exceptional. Its trademark infringement claim survived summary judgement. *Fogerty*, 510 U.S. at 534. While the evidence at trial constituted substantial and persuasive evidence of non-

11

infringement, there were some *Sleekcraft* factors which weighed in BillFloat's favor. Further, BillFloat's litigation conduct was not especially unreasonable. All factors considered, this case is not "exceptional." Defendants thus are not entitled to recover attorneys' fees under the Lanham Act.

### D. Defendants' Requested Attorneys' Fees Are Mostly Reasonable

Defendants did not apportion attorneys' fees for the breach of contract claim specifically; instead, they calculated the attorneys' though June 15, 2022—the day when the Court granted them summary judgment on the contract claim—in the amount of $121,306.75 at an hourly rate of $395 and $325 for the two Defendants' counsel respectively. (Def. Reply at 6 n.2.) BillFloat does not dispute the hourly rate but contends that Defendants have failed to provide a breakdown of the time spent on the breach of contract claim. (BF Opp. at 20–22.).

The Court has reviewed Defendants' billing record and found the time entries to be mostly reasonable. Much of the substantive work prior to summary judgment was interrelated. For example, all the claims share the same witnesses in this case. But because the record makes it difficult to discern with any degree of precision which portion of the fees may have been devoted to the Lanham Act claim exclusively, the Court reduces the requested fees by twenty-five percent for Defendants' block billing. *See Welch v. Met. Life Inc. Co.*, 480 F.3d 942, 948 (9th Cir. 2007) (block billing may justify a reduction of up to 30 percent); *see also Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 968 (N.D. Cal. 2014) (construing *Welch* to allow a district court to reduce block-billed hours by 10% to 30%.). It awards Defendants' attorneys' fees in the amount of $90,980.06.

### E. Defendants Are Not Entitled to Non-Taxable Costs

Defendants seek to recover, under the Lanham Act and the Agreement, non-taxable costs that they incurred: (1) for their expert witness, Mark Keegan; (2) for their depositions and hearings; and (3) for their travel costs. (Def. Mot. at 2, 18.) Because this case is not exceptional, Defendants may not recover non-taxable costs under the Lanham Act. *See Sophia & Chloe, Inc. v. Brighton Collectibles, Inc.*, No. 12-CV-2472-AJB-KSC, 2019 U.S. Dist. LEXIS 54576, at *29-30 (S.D. Cal. Mar. 29, 2019) (holding a case that was note exceptional was not entitled to non-taxable costs.) Further, the Agreement only allows attorneys' fees. The Court thus will only

allow reasonable costs under 28 U.S.C. §§ 1821 and 1920. *See Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 877 (2019) (explaining that absent federal statutes that go beyond, federal courts are limited to awarding the costs specified in 28 U.S.C. §§ 1821 and 1920.).

## V. CONCLUSION

The Court **DENIES** Plaintiff's motion for JMOL or a new trial. The Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion for attorneys' fees. The Court **ORDERS** Defendants to file a bill of taxable costs.

Having considered BillFloat's motion to file documents under seal (Docket No. 141) and the supporting materials, the Court hereby **GRANTS** the motion.

This order disposes of Docket Nos. 137, 138, and 141. The Clerk is instructed to enter judgment and close the case.

**IT IS SO ORDERED**.

Dated: March 1, 2023

_____
EDWARD M. CHEN
United States District Judge